Because Preap and Khoury created a split with four other Courts of Appeals, we granted certiorari to review the Ninth Circuit's ruling that criminal aliens who are not arrested immediately upon release are thereby exempt from mandatory detention under § 1226(c). 583 U.S. ----, 138 S.Ct. 1279, 200 L.Ed.2d 468 (2018). We now reverse.
II
Before addressing the merits of the Court of Appeals' interpretation, we resolve four questions regarding our jurisdiction to hear these cases.
The first potential hurdle concerns § 1226(e), which states:
"The [Secretary's] discretionary judgment regarding the application of [ § 1226 ] shall not be subject to review. No court may set aside any action or *962 decision by the [Secretary] under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." (Emphasis added.)
As we have held, this limitation applies only to "discretionary" decisions about the "application" of § 1226 to particular cases. It does not block lawsuits over "the extent of the Government's detention authority under the 'statutory framework' as a whole." Jenningsv . Rodriguez , 583 U.S. ----, ---- - ----, 138 S.Ct. 830, 841, 200 L.Ed.2d 122 (2018) (quoting Demore , 538 U.S. at 517, 123 S.Ct. 1708 ). And the general extent of the Government's authority under § 1226(c) is precisely the issue here. Respondents' argument is not that the Government exercised its statutory authority in an unreasonable fashion. Instead, they dispute the extent of the statutory authority that the Government claims. Because this claim of authority does not constitute a mere "discretionary" "application" of the relevant statute, our review is not barred by § 1226(e).
Nor are we stripped of jurisdiction by § 1252(b)(9), which provides:
"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter [including §§ 1225 and 1226 ] shall be available only in judicial review of a final order under this section." (Emphasis added.)
As in Jennings , respondents here "are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal [as opposed to the decision to deny them bond hearings]; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances," we held in Jennings , see 583 U.S., at ---- - ----, 138 S.Ct., at 841, " § 1252(b)(9) does not present a jurisdictional bar."
The Government raised a third concern before the District Court in Preap : that under 8 U.S.C. § 1252(f)(1), that court lacked jurisdiction to enter the requested injunction. As § 1252(f)(1) cautions:
"Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [§§ 1221-1232] other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."
Did the Preap court overstep this limit by granting injunctive relief for a class of aliens that includes some who have not yet faced-but merely "will face"-mandatory detention? The District Court said no, but we need not decide. Whether the Preap court had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief, and for independent reasons given below, we are ordering the dissolution of the injunction that the District Court ordered.
Finally, and again before the Preap District Court, the Government raised a fourth potential snag: mootness. Class actions are "[n]ormally ... moot if no named class representative with an unexpired claim remain[s] at the time of class certification." United States v . Sanchez-Gomez , 584 U.S. ----, ----, 138 S.Ct. 1532, 1538, 200 L.Ed.2d 792 (2018). But that general norm is no hurdle here.
*963 The suggestion of mootness in these cases was based on the fact that by the time of class certification the named plaintiffs had obtained either cancellation of removal or bond hearings. See 831 F.3d at 1197-1198 ; Khoury v. Asher , 3 F.Supp.3d 877, 879-880 (W.D. Wash. 2014). But those developments did not make the cases moot because at least one named plaintiff in both cases had obtained release on bond, as opposed to cancellation of removal, and that release had been granted following a preliminary injunction in a separate case. Unless that preliminary injunction was made permanent and was not disturbed on appeal, these individuals faced the threat of re-arrest and mandatory detention. And indeed, we later ordered that that injunction be dissolved. See Jennings , 583 U.S., at ----, 138 S.Ct., at 852. Thus, in both cases, there was at least one named plaintiff with a live claim when the class was certified.
Even if that had not been so, these cases would not be moot because the fact that a class "was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction" when, as in these cases, the harms alleged are transitory enough to elude review. County of Riverside v. McLaughlin , 500 U.S. 44, 52, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (affirming jurisdiction over a class action challenging a county's failure to provide "prompt" determinations of probable cause for those subjected to warrantless arrest and detention). Respondents claim that they would be harmed by detention without a hearing pending a decision on their removal. Because this type of injury ends as soon as the decision on removal is made, it is transitory. So the fact that the named plaintiffs obtained some relief before class certification does not moot their claims.
III
Having assured ourselves of our jurisdiction, we turn to the merits. Respondents contend that they are not properly subject to § 1226(c)'s mandatory-detention scheme, but instead are entitled to the bond hearings available to those held under the general arrest and release authority provided in § 1226(a). Respondents' primary textual argument turns on the interaction of paragraphs (1) and (2) of § 1226(c). Recall that those paragraphs govern, respectively, the "[c]ustody" and "[r]elease" of criminal aliens guilty of a predicate offense. Paragraph (1) directs the Secretary to arrest any such alien "when the alien is released," and paragraph (2) forbids the Secretary to release any "alien described in paragraph (1)" pending a determination on removal (with one exception not relevant here). Because the parties' arguments about the meaning of § 1226(c) require close attention to the statute's terms and structure, we reproduce the provision in full below. But only the portions of the statute that we have highlighted are directly relevant to respondents' argument. Section 1226(c) provides:
"(c) Detention of criminal aliens
"(1) Custody
"The [Secretary] shall take into custody any alien who-
"(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
"(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
"(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or
"(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title, *964 "when the alien is released , without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
"(2) Release
"The [Secretary] may release an alien described in paragraph (1) only if the [Secretary] decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the [Secretary] that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien." (Emphasis added.)
Respondents argue that they are not subject to mandatory detention because they are not "described in" § 1226(c)(1), even though they (and all the other members of the classes they represent) fall into at least one of the categories of aliens covered by subparagraphs (A)-(D) of that provision. An alien covered by these subparagraphs is not "described in" § 1226(c)(1), respondents contend, unless the alien was also arrested "when [he or she was] released" from criminal custody. Indeed, respondents insist that the alien must have been arrested immediately after release. Since they and the other class members were not arrested immediately, respondents conclude, they are not "described in" § 1226(c)(1). So to detain them, the Government must rely not on § 1226(c) but on the general provisions of § 1226(a). And thus, like others detained under § 1226(a), they are owed bond hearings in which they can earn their release by proving that they pose no flight risk and no danger to others-or so they claim. But neither the statute's text nor its structure supports this argument. In fact, both cut the other way.
A
First, respondents' position runs aground on the plain text of § 1226(c). Respondents are right that only an alien "described in paragraph (1)" faces mandatory detention, but they are wrong about which aliens are "described in" paragraph (1).
Paragraph (1) provides that the Secretary "shall take" into custody any "alien" having certain characteristics and that the Secretary must do this "when the alien is released" from criminal custody. The critical parts of the provision consist of a verb ("shall take"), an adverbial clause ("when ... released"), a noun ("alien"), and a series of adjectival clauses ("who ... is inadmissible," "who ... is deportable," etc.). As an initial matter, no one can deny that the adjectival clauses modify (and in that sense "describ[e]") the noun "alien" or that the adverbial clause "when ... released" modifies the verb "shall take." And since an adverb cannot modify a noun, the "when released" clause cannot modify "alien." Again, what modifies (and in that sense "describe[s]") the noun "alien" are the adjectival clauses that appear in subparagraphs (A)-(D).
Respondents and the dissent contend that this grammatical point is not the end of the matter-that an adverb can "describe" a person even though it cannot modify the noun used to denote that person. See post , at 978 - 979 (opinion of BREYER, J.). But our interpretation is *965 not dependent on a rule of grammar. The preliminary point about grammar merely complements what is critical, and indeed conclusive in these cases: the particular meaning of the term "described" as it appears in § 1226(c)(2). As we noted in Luna Torres v . Lynch , 578 U.S. ----, ----, 136 S.Ct. 1619, 1625, 194 L.Ed.2d 737 (2016), the term " 'describe' takes on different meanings in different contexts." A leading definition of the term is "to communicate verbally ... an account of salient identifying features," Webster's Third New International Dictionary 610 (1976), and that is clearly the meaning of the term used in the phrase "an alien described in paragraph (1)." (Emphasis added.) This is clear from the fact that the indisputable job of the "descri[ption] in paragraph (1)" is to "identif[y]" for the Secretary-to list the "salient ... features" by which she can pick out-which aliens she must arrest immediately "when [they are] released."
And here is the crucial point: The "when ... released" clause could not possibly describe aliens in that sense; it plays no role in identifying for the Secretary which aliens she must immediately arrest. If it did, the directive in § 1226(c)(1) would be nonsense. It would be ridiculous to read paragraph (1) as saying: "The Secretary must arrest, upon their release from jail, a particular subset of criminal aliens. Which ones? Only those who are arrested upon their release from jail." Since it is the Secretary's action that determines who is arrested upon release, "being arrested upon release" cannot be one of her criteria in figuring out whom to arrest. So it cannot "describe"-it cannot give the Secretary an "identifying featur[e]" of-the relevant class of aliens. On any other reading of paragraph (1), the command that paragraph (1) gives the Secretary would be downright incoherent.
Our reading is confirmed by Congress's use of the definite article in "when the alien is released." Because "[w]ords are to be given the meaning that proper grammar and usage would assign them," A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012), the "rules of grammar govern" statutory interpretation "unless they contradict legislative intent or purpose," ibid. (citing Costello v. INS , 376 U.S. 120, 122-126, 84 S.Ct. 580, 11 L.Ed.2d 559 (1964) ). Here grammar and usage establish that "the" is "a function word ... indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context." Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005). See also Work v. United States ex rel. McAlester-Edwards Co. , 262 U.S. 200, 208, 43 S.Ct. 580, 67 L.Ed. 949 (1923) (Congress's "use of the definite article [in a reference to "the appraisement"] means an appraisement specifically provided for"). For "the alien"-in the clause "when the alien is released"-to have been previously specified, its scope must have been settled by the time the "when ... released" clause appears at the tail end of paragraph (1).
For these reasons, we hold that the scope of "the alien" is fixed by the predicate offenses identified in subparagraphs (A)-(D).[5] And since only those subparagraphs settle who is "described in paragraph (1)," anyone who fits their description falls under paragraph (2)'s detention mandate-even if (as with respondents) the Secretary did not arrest them immediately "when" they were "released."
B
*966 In reaching the contrary conclusion, the Ninth Circuit thought that the very structure of § 1226 favors respondents' reading. In particular, the Ninth Circuit reasoned, each subsection's arrest and release provisions must work together. Thus, aliens must be arrested under the general arrest authority in subsection (a) in order to get a bond hearing under subsection (a)'s release provision. And in order to face mandatory detention under subsection (c), criminal aliens must have been arrested under subsection (c). But since subsection (c) authorizes only immediate arrest, the argument continues, those arrested later fall under subsection (a), not (c). Accordingly, the court concluded, those arrested well after release escape subsection (c)'s detention mandate. See 831 F.3d at 1201-1203. But this argument misreads the structure of § 1226 ; and in any event, the Ninth Circuit's conclusion would not follow even if we granted all its premises about statutory structure.
1
Although the Ninth Circuit viewed subsections (a) and (c) as establishing separate sources of arrest and release authority, in fact subsection (c) is simply a limit on the authority conferred by subsection (a).
Recall that subsection (a) has two sentences that provide the Secretary with general discretion over the arrest and release of aliens, respectively. We read each of subsection (c)'s two provisions-paragraph (1) on arrest, and paragraph (2) on release-as modifying its counterpart sentence in subsection (a). In particular, subsection (a) creates authority for anyone's arrest or release under § 1226-and it gives the Secretary broad discretion as to both actions-while subsection (c)'s job is to subtract some of that discretion when it comes to the arrest and release of criminal aliens. Thus, subsection (c)(1) limits subsection (a)'s first sentence by curbing the discretion to arrest: The Secretary must arrest those aliens guilty of a predicate offense. And subsection (c)(2) limits subsection (a)'s second sentence by cutting back the Secretary's discretion over the decision to release: The Secretary may not release aliens "described in" subsection (c)(1)-that is, those guilty of a predicate offense. Accordingly, all the relevant detainees will have been arrested by authority that springs from subsection (a), and so, contrary to the Court of Appeals' view, that fact alone will not spare them from subsection (c)(2)'s prohibition on release. This reading comports with the Government's practice of applying to the arrests of all criminal aliens certain procedural requirements, such as the need for a warrant, that appear only in subsection (a). See Tr. of Oral Arg. 13-14.
The text of § 1226 itself contemplates that aliens arrested under subsection (a) may face mandatory detention under subsection (c). The second sentence in subsection (a)-which generally authorizes the Secretary to release an alien pending removal proceedings-features an exception "as provided in subsection (c)." But if the Court of Appeals were right that subsection (c)(2)'s prohibition on release applies only to those arrested pursuant to subsection (c)(1), there would have been no need to specify that such aliens are exempt from subsection (a) 's release provision. This shows that it is possible for those arrested under subsection (a) to face mandatory detention under subsection (c). We draw a similar inference from the fact that subsection (c)(2), for its part, does not limit mandatory detention to those arrested "pursuant to" subsection (c)(1) or "under authority created by" subsection (c)(1)-but to anyone so much as "described in" subsection (c)(1). This choice of *967 words marks a contrast with Congress's reference-in the immediately preceding subsection-to actions by the Secretary that are "authorized under" subsection (a). See § 1226(b). Cf. 18 U.S.C. § 3262(b) (referring to "a person arrested under subsection (a)" (emphasis added)). These textual cues indicate that even if an alien was not arrested under authority bestowed by subsection (c)(1), he may face mandatory detention under subsection (c)(2).
2
But even if the Court of Appeals were right to reject this reading, the result below would be wrong. To see why, assume with the Court of Appeals that only someone arrested under authority created by § 1226(c)(1) -rather than the more general § 1226(a) -may be detained without a bond hearing. And assume that subsection (c)(1) requires immediate arrest. Even then, the Secretary's failure to abide by this time limit would not cut off her power to arrest under subsection (c)(1). That is so because, as we have held time and again, an official's crucial duties are better carried out late than never. See Sylvain v. Attorney General of U.S. , 714 F.3d 150, 158 (CA3 2013) (collecting cases). Or more precisely, a statutory rule that officials " 'shall' act within a specified time" does not by itself "preclud[e] action later." Barnhart v. Peabody Coal Co. , 537 U.S. 149, 158, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003).
Especially relevant here is our decision in United States v. Montalvo-Murillo , 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990). There we held that "a provision that a detention hearing 'shall be held immediately upon the [detainee's] first appearance before the judicial officer' did not bar detention after a tardy hearing." Barnhart , 537 U.S. at 159, 123 S.Ct. 748 (quoting Montalvo-Murillo , 495 U.S. at 714, 110 S.Ct. 2072 ). In that case, we refused to "bestow upon the defendant a windfall" and "visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants every time some deviation from the [statutory] strictures ... occur[red]." Montalvo-Murillo , 495 U.S. at 720, 110 S.Ct. 2072. Instead, we gave effect to the principle that " 'if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.' " Barnhart , 537 U.S. at 159, 123 S.Ct. 748 (quoting United States v. James Daniel Good Real Property , 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ).
This principle for interpreting time limits on statutory mandates was a fixture of the legal backdrop when Congress enacted § 1226(c). Cf. Woodford v. Garceau , 538 U.S. 202, 209, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003) (relying on the "legal backdrop" against which "Congress legislated" to clarify what Congress enacted). Indeed, we have held of a statute enacted just four years before § 1226(c) that because of our case law at the time-never since abrogated-Congress was "presumably aware that we do not readily infer congressional intent to limit an agency's power to get a mandatory job done merely from a specification to act by a certain time." Barnhart , 537 U.S. at 160, 123 S.Ct. 748 (relying on Brock v. Pierce County , 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) ). Here this principle entails that even if subsection (c)(1) were the sole source of authority to arrest aliens without granting them hearings, that authority would not evaporate just because officials had transgressed subsection (c)(1)'s command to arrest aliens immediately "when ... released."
Respondents object that the rule invoked in Montalvo-Murillo and related *968 cases does not apply here. In those cases, respondents argue, the governmental authority at issue would have disappeared entirely if time limits were enforced-whereas here the Secretary could still arrest aliens well after their release under the general language in § 1226(a).
But the whole premise of respondents' argument is that if the Secretary could no longer act under § 1226(c), she would lose a specific power-the power to arrest and detain criminal aliens without a bond hearing. If that is so, then as in other cases, accepting respondents' deadline-based argument would be inconsistent with "the design and function of the statute." Montalvo-Murillo , 495 U.S. at 719, 110 S.Ct. 2072. From Congress's perspective, after all, it is irrelevant that the Secretary could go on detaining criminal aliens subject to a bond hearing. Congress enacted mandatory detention precisely out of concern that such individualized hearings could not be trusted to reveal which "deportable criminal aliens who are not detained" might "continue to engage in crime [or] fail to appear for their removal hearings." Demore , 538 U.S. at 513, 123 S.Ct. 1708. And having thus required the Secretary to impose mandatory detention without bond hearings immediately, for safety's sake, Congress could not have meant for judges to "enforce" this duty in case of delay by-of all things-forbidding its execution. Cf. Montalvo-Murillo , 495 U.S. at 720, 110 S.Ct. 2072 ("The end of exacting compliance with the letter" of the Bail Reform Act's requirement that a defendant receive a hearing immediately upon his first appearance before a judicial officer "cannot justify the means of exposing the public to an increased likelihood of violent crimes by persons on bail, an evil the statute aims to prevent").
Especially hard to swallow is respondents' insistence that for an alien to be subject to mandatory detention under § 1226(c), the alien must be arrested on the day he walks out of jail (though respondents allow that it need not be at the jailhouse door-the "parking lot" or "bus stop" would do). Tr. of Oral Arg. 44. "Assessing the situation in realistic and practical terms, it is inevitable that" respondents' unsparing deadline will often be missed for reasons beyond the Federal Government's control. Montalvo-Murillo , 495 U.S. at 720, 110 S.Ct. 2072. Cf. Regions Hospital v. Shalala , 522 U.S. 448, 459, n. 3, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) ("The Secretary's failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that [she] lacked power to act beyond it"). To give just one example, state and local officials sometimes rebuff the Government's request that they give notice when a criminal alien will be released. Indeed, over a span of less than three years (from January 2014 to September 2016), the Government recorded "a total of 21,205 declined [requests] in 567 counties in 48 states including the District of Columbia." ICE, Fiscal Year 2016 ICE Enf. and Removal Operations Rep. 9. Nor was such local resistance unheard of when Congress enacted the language of § 1226(c) in 1996. See S. Rep. No. 104-48, p. 28 (1995). Under these circumstances, it is hard to believe that Congress made the Secretary's mandatory-detention authority vanish at the stroke of midnight after an alien's release.
In short, the import of our case law is clear: Even if subsection (c) were the only font of authority to detain aliens without bond hearings, we could not read its "when ... released" clause to defeat officials' duty to impose such mandatory detention when it comes to aliens who are arrested well after their release.
*969 IV
Respondents protest that reading § 1226(c) in the manner set forth here would render key language superfluous, lead to anomalies, and violate the canon of constitutional avoidance. We answer these objections in turn.
A
According to respondents, the Government's reading of § 1226(c) flouts the interpretive canon against surplusage-the idea that "every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia, Reading Law, at 174. See Kungys v. United States , 485 U.S. 759, 778, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (plurality opinion of Scalia, J.) (citing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant"). Respondents' surplusage argument has two focal points.
First, respondents claim that if they face mandatory detention even though they were arrested well after their release, then "when ... released" adds nothing to paragraph (1). In fact, however, it still has work to do. For one thing, it clarifies when the duty to arrest is triggered: upon release from criminal custody, not before such release or after the completion of noncustodial portions of a criminal sentence (such as a term of "parole, supervised release, or probation," as the paragraph goes on to emphasize). Thus, paragraph (1) does not permit the Secretary to cut short an alien's state prison sentence in order to usher him more easily right into immigration detention-much as another provision prevents officials from actually removing an alien from the country "until the alien is released from imprisonment." 8 U.S.C. § 1231(a)(4)(A). And from the other end, as paragraph (1)'s language makes clear, the Secretary need not wait for the sentencing court's supervision over the alien to expire.
The "when ... released" clause also serves another purpose: exhorting the Secretary to act quickly. And this point answers respondents' second surplusage claim: that the "Transition Period Custody Rules" enacted along with § 1226(c) would have been superfluous if § 1226(c) did not call for immediate arrests, since those rules authorized delays in § 1226(c)'s implementation while the Government expanded its capacities. See Matter of Garvin-Noble , 21 I. & N. Dec. 672, 675 (BIA 1997). This argument again confuses what the Secretary is obligated to do with the consequences that follow if the Secretary fails (for whatever reason) to fulfill that obligation. The transition rules delayed the onset of the Secretary's obligation to begin making arrests as soon as covered aliens were released from criminal custody, and in that sense they were not superfluous.[6]
*970 This is so even though, had the transition rules not been adopted, the Secretary's failure to make an arrest immediately upon a covered alien's release would not have exempted the alien from mandatory detention under § 1226(c).
B
The Court of Appeals objected that the Government's reading of § 1226(c) would have the bizarre result that some aliens whom the Secretary need not arrest at all must nonetheless be detained without a hearing if they are arrested. 831 F.3d at 1201-1203. This rather complicated argument, as we understand it, proceeds as follows. Paragraph (2) requires the detention of aliens "described in paragraph (1)." While most of the aliens described there have been convicted of a criminal offense, this need not be true of aliens captured by subparagraph (D) in particular-which covers, for example, aliens who are close relatives of terrorists and those who are believed likely to commit a terrorist act. See § 1182(a)(3)(B)(i)(IX). But if, as the Government maintains, any alien who falls under subparagraphs (A)-(D) is thereby ineligible for release from immigration custody, then the Secretary would be forbidden to release even these aliens who were never convicted or perhaps even charged with a crime, once she arrested them. Yet she would be free not to arrest them to begin with (or so the Court of Appeals assumed), since she is obligated to arrest aliens "when ... released," and there was no prior custody for these aliens to be "released" from . Therefore, the court concluded, the Government's position has the absurd implication that aliens who were never charged with a crime need not be arrested pending a removal determination, but if they are arrested, they must be detained and cannot be released on bond or parole.
We agree that it would be very strange for Congress to forbid the release of aliens who need not be arrested in the first place, but the fact is that the Government's reading (and ours) does not have that incongruous result. The real anomalies here would flow instead from the Court of Appeals' interpretation.
To begin with the latter point: Under the Court of Appeals' reading, the mandatory-detention scheme would be gentler on terrorists than it is on garden-variety offenders. To see why, recall first that subparagraphs (A)-(C) cover aliens who are inadmissible or deportable based on the commission of certain criminal offenses, and there is no dispute that the statute authorizes their mandatory detention when they are released from criminal custody. And the crimes covered by these subparagraphs include, for example, any drug offense by an adult punishable by more than one year of imprisonment, see §§ 1182(a)(2), 1226(c)(1)(A), as well as a variety of tax offenses, see §§ 1226(c)(1)(B), 1227(a)(2)(A)(iii) ; Kawashima v. Holder , 565 U.S. 478, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012). But notice that aliens who fall within subparagraph (D), by contrast, may never have been arrested on criminal charges-which according to the court below would exempt them from mandatory detention. Yet this subparagraph covers the very sort of aliens for which Congress was most likely to have wanted to require mandatory detention-including those who are representatives of a terrorist group and those whom the Government has reasonable grounds to believe are likely to engage in terrorist activities. See *971 §§ 1182(a)(3)(B)(i)(III), (IV), 1226(c)(1)(D).[7] Thus, by the Court of Appeals' logic, Congress chose to spare terrorist aliens from the rigors of mandatory detention-a mercy withheld from almost all drug offenders and tax cheats. See Brief for National Immigrant Justice Center as Amicus Curiae 7-8. That result would be incongruous.
Along similar lines, note that one § 1226(c)(1) predicate reaches aliens who necessarily escape conviction: those "for whom immunity from criminal jurisdiction was exercised." § 1182(a)(2)(E)(ii). See § 1226(c)(1)(A). And other predicates sweep in aliens whom there is no reason to expect police (as opposed to immigration officials) will have reason to arrest: e.g. , the "spouse or child of an alien" who recently engaged in terrorist activity. § 1182(a)(3)(B)(i)(IX) ; see § 1226(c)(1)(D). It would be pointless for Congress to have covered such aliens in subsections (c)(1)(A)-(D) if subsection (c)'s mandates applied only to those emerging from jail.
Thus, contrary to the Court of Appeals' interpretation of the "when released" clause as limiting the class of aliens subject to mandatory detention, we read subsection (c)(1) to specify the timing of arrest ("when the alien is released") only for the vast majority of cases: those involving criminal aliens who were once in criminal custody. The paragraph simply does not speak to the timeline for arresting the few who had no stint in jail. (And why should it? Presumably they-unlike those serving time-are to be detained as they come across the Government's radar and any relevant evidentiary standards are satisfied.[8] )
In short, we read the "when released" directive to apply when there is a release. In other situations, it is simply not relevant. It follows that both of subsection (c)'s mandates-for arrest and for release-apply to any alien linked with a predicate offense identified in subparagraphs (A)-(D), regardless of exactly when or even whether the alien was released from criminal custody.
C
Finally, respondents perch their reading of § 1226(c) -unsteadily, as it turns out-on the canon of constitutional avoidance. This canon provides that "[w]hen 'a serious doubt' is raised about the constitutionality of an act of Congress, '... this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " Jennings , 583 U.S., at ----, 138 S.Ct., at 842 (quoting Crowell v. Benson , 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ).
Respondents say we should be uneasy about endorsing any reading of § 1226(c) that would mandate arrest and detention years after aliens' release from criminal custody-when many aliens will have developed strong ties to the country and a good chance of being allowed to stay if given a hearing. At that point, respondents *972 argue, mandatory detention may be insufficiently linked to public benefits like protecting others against crime and ensuring that aliens will appear at their removal proceedings. In respondents' view, detention in that scenario would raise constitutional doubts under Zadvydas v. Davis , 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), which held that detention violates due process absent "adequate procedural protections" or "special justification[s]" sufficient to outweigh one's " 'constitutionally protected interest in avoiding physical restraint,' " id. , at 690, 121 S.Ct. 2491 (quoting Kansas v. Hendricks , 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ). Thus, respondents urge, we should adopt a reading of § 1226(c) -their reading-that avoids this result.
The trouble with this argument is that constitutional avoidance " 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.' " Jennings , 583 U.S., at ----, 138 S.Ct., at 842. The canon "has no application" absent "ambiguity." Wargerv . Shauers , 574 U.S. 40, 50, 135 S.Ct. 521, 190 L.Ed.2d 422 (2014) (internal quotation marks omitted). See also Zadvydas , 533 U.S. at 696, 121 S.Ct. 2491 ("Despite this constitutional problem, if Congress has made its intent in the statute clear, we must give effect to that intent" (internal quotation marks omitted)). Here the text of § 1226 cuts clearly against respondents' position, see Part III, supra , making constitutional avoidance irrelevant.
We emphasize that respondents' arguments here have all been statutory. Even their constitutional concerns are offered as just another pillar in an argument for their preferred reading of the language of § 1226(c) -an idle pillar here because the statute is clear. While respondents might have raised a head-on constitutional challenge to § 1226(c), they did not. Our decision today on the meaning of that statutory provision does not foreclose as-applied challenges-that is, constitutional challenges to applications of the statute as we have now read it.
* * *
The judgments of the Court of Appeals for the Ninth Circuit are reversed, and the cases are remanded for further proceedings.
It is so ordered.

For this reason, it is irrelevant that (as the dissent notes, see post , at 980) paragraph (2) applies to aliens described in "paragraph (1)" and not "subparagraphs (A)-(D)." These two phrases denote the same category, so nothing can be gleaned from Congress's choice of one over the other.

The dissent asks why Congress would have felt the need to provide for a delay if it thought that either way, the Secretary would get to deny a hearing to aliens arrested well after release. Post , at 981; see also post , at 982 - 984. The answer is that Congress does not draft legislation in the expectation that the Executive will blow through the deadlines it sets. That is why Congress specifies any deadlines for executive duties at all; and here it explains why Congress furthermore provided that the deadline it set for this particular duty (to arrest criminal aliens upon their release ) would not take effect right away.
In fact, if the dissent's argument from the transition rules were sound-i.e. , if textual evidence that Congress expects the Executive to meet a deadline (once it officially takes effect) were proof that Congress wanted the deadline enforced by courts -then every case involving an express statutory deadline would be one in which Congress intended for courts to enforce the deadline. But this would include, by definition, all of the loss-of-authority cases we discussed above, see Part III-B-2, supra -a long line of precedent that the dissent does not question.

In Alafyouny , 2006 WL 1581959, for example, an alien subject to mandatory detention had not been charged with any crime. Rather, in a hearing to consider his application for adjustment of status, an immigration judge found that the alien had engaged in terrorism-related activity identified in § 1182(a)(3)(B)(iv)(IV)(cc), which qualified him for mandatory detention under § 1226(c)(1)(D). Id ., at *3, *24.

See n. 7, supra . Detainees who deny that they satisfy any § 1226(c) predicate may challenge their mandatory detention in a Joseph hearing. See Matter of Joseph , 22 I. & N. Dec. 799 (BIA 1999). See also Jenningsv.Rodriguez , 583 U.S. ----, ----, n. 1, 138 S.Ct. 830, 838, n. 1, 200 L.Ed.2d 122 (2018).