IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39048-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DUSTIN GENE ABRAMS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Dustin Abrams seeks, on appeal, a ruling striking a victim penalty assessment (VPA) entered for six 2004 convictions and the vacation of the six convictions. The latter request requires that we discern whether RCW 9.94A.640(2) allows a vacatur when the offender is incarcerated for offenses other than the offenses sought to be vacated. We grant Abrams' request to remove the VPA. We read RCW 9.94A.640(2) to permit a vacatur when the applicant remains in prison for other offenses, but reject, without prejudice, Abrams' request to vacate the 2004 convictions because of no showing of rehabilitation.

## FACTS

In April 2004, the State charged, under Grant County cause number 04-1-00255-1, Dustin Abrams with four counts of possessing a stolen firearm, four counts of theft of a firearm, and four counts of unlawful possession of a firearm in the second degree. Mike

Mallon, a 79-year-old man who lived in a remote area of Grant County, was the victim of the thefts. In June 2004, the State amended the information to reduce the number of charged crimes to six. Abrams pled guilty to those six charges: four counts of theft of a firearm, one count of theft in the first degree, and one count of theft in the second degree. We collectively refer to those six convictions as the 2004 convictions. The trial court sentenced Abrams to thirty months in confinement and ordered him to pay the following legal financial obligations: a $500.00 VPA, a $110.00 criminal filing fee, a $509.10 sheriff services fee, and a $500.00 fee for his court-appointed attorney.

During Dustin Abrams' time in prison for the theft convictions, Grant County detectives unearthed evidence that Abrams killed Mike Mallon. Abrams remained incarcerated, after completion of his sentence for the thefts, while awaiting trial for murder. He later pled guilty to the murder charge. He remains in prison today and has never been released since 2004.

On November 29, 2021, Dustin Abrams filed a motion for an order waiving all of his legal financial obligations from the 2004 prosecution. On December 6, 2021, the superior court granted the motion in part. The order confirming the ruling declares: "[a]ll discretionary LFO's [sic] are waived and interest." Clerk's Papers (CP) at 82. We read the order as retaining in effect all mandatory obligations. The order did not distinguish between discretionary and nondiscretionary legal financial obligations.

2

PROCEDURE

On June 1, 2022, Dustin Abrams filed another motion with the superior court for an order waiving legal financial obligations.  The motion did not identify the discrete obligations that Abrams requested be stricken.  The June 1 motion is one of two motions now being reviewed by this court.  Abrams filed with the motion a declaration that avowed his financial inability to pay obligations.

On June 15, 2022, the superior court denied, without any argument, Dustin Abrams' second motion to waive legal financial obligations.  The written order explained that the court denied the motion because "RCW 10.82.090(2) allows for waiver 'following the offender's release from total confinement.'  [sic] Defendant is in custody at DOC."  CP at 89.

On June 17, 2022, Dustin Abrams filed a motion and declaration for an order vacating the record of his six 2004 felony convictions.  This motion is the second motion on review before this court.  That same day, the trial court denied the motion on the ground that, under RCW 9.94A.640(2), the offender may not gain a vacatur until five years after the offender's release from confinement.

On August 15, 2022, Dustin Abrams filed, with the superior court, a motion for an order of indigency, in which he certified:

> [(1)] That I am the named defendant and I wish to appeal the judgment that was entered in the above-entitled case; (2) I own no real property; (3) That I own no personal property other than my personal

3

effects; (4) No income whatsoever; (5) That I have undischarged LFOs in all Grant County Superior Court Cases; (6) That I am without other means to prosecute said appeal and desire that public funds are expended for that purpose; (7) That I can contribute $0.00; (8) That brief statement was already filed with this court; (9) I ask that the court to [sic] provide the following at public expense: All filing fees, attorney fees, preparation, reproduction, and distribution of briefs, preparation of verbatim report of proceedings, and preparation of necessary clerk's papers; (10) I do not have the funds to pay for an appeal, I have been indigent since March 31, 2004 to date and will always be indigent.

CP at 95. On August 16, the superior court granted the motion and entered an order of indigency.

## LAW AND ANALYSIS

### Legal Financial Obligations

Before addressing the merits of Dustin Abrams' motion to strike legal financial obligations, we entertain the State's argument that Abrams lacks a right to appeal as a matter of right the superior court's denial of the second motion to strike. The State may be correct in accordance with *State v. Wilson*, 198 Wn. App. 632, 635, 393 P.3d 892 (2017). But, in accordance with *State v. Abrams*, No. 39050-1-III (Wash. Ct. App. Aug. 22, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/390501_unp.pdf, wherein Dustin Abrams sought the striking of legal financial obligations for convictions other than his 2004 convictions, we exercise our discretion to grant discretionary review on our own motion. RAP 1.2(c); *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015).

Dustin Abrams filed two motions for an order waiving legal financial obligations entered in the 2004 prosecution: first on November 29, 2021 and again on June 1, 2022. On December 6, 2021, the trial court granted the November 29 motion and struck all "discretionary" legal financial obligations with interest. The order did not identify those obligations deemed discretionary.

In 2018, the Washington Legislature amended the law to prohibit charging the $200 criminal filing fee to defendants who are indigent at the time of sentencing. LAWS Of 2018, ch. 269, § 17; *State v. Ramirez*, 191 Wn.2d 732, 748, 426 P.3d 714 (2018). The legislature also revoked, for indigent offenders, imposition of expenses incurred by the State in prosecuting the defendant, such as sheriff's fees. RCW 10.01.160(2); *State v. Landrum*, No. 33812-6-III (Wash. Ct. App. June 20, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/338126_unp.pdf. Finally, court-appointed attorney fees became discretionary. *State v. Glover*, 4 Wn. App. 2d 690, 695, 423 P.3d 290 (2018). Thus, when the superior court signed the December 6 order, only the $500 VPA remained as a judgment against Dustin Abrams.

When Dustin Abrams filed, on June 1, 2022, his second motion for waiver of legal financial obligations, Washington law still deemed the VPA to be a mandatory obligation. Nevertheless, in April 2023, the Washington Legislature adopted Engrossed Substitute House Bill 1169, and this law became effective on July 1, 2023. LAWS OF 2023, ch. 449, § 27. Under this bill, the superior court may no longer impose a VPA if

the court adjudges the defendant to be indigent at the time of sentencing. Laws of 2023, ch. 449, § 1. RCW 7.68.035(4) now reads:

> The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3).

Dustin Abrams argues that RCW 7.68.035(4) applies to his case because the 2023 bill went into effect while this direct appeal was pending. We agree. Changes in the law with regard to legal financial obligations apply to cases pending on direct review and not yet final at the time the new law became effective. *State v. Ramirez*, 191 Wn. 2d 732, 747 (2018).

We still must decide whether Dustin Abrams was indigent at the time of sentencing in 2004. RCW 10.01.160 states, in relevant part, that

> a defendant is "indigent" if the defendant:
> (a) Meets the criteria defined in RCW 10.101.010(3) (a) through (c);
> (b) is homeless or mentally ill as defined in RCW 71.24.025;
> (c) has household income above 125 percent of the federal poverty guidelines and has recurring basic living costs, as defined in RCW 10.101.010, that render the defendant without the financial ability to pay; or
> (d) has other compelling circumstances that exist that demonstrate an inability to pay.

RCW 10.01.160(3). RCW 10.101.010(3) provides that

> "[i]ndigent" means a person who, at any stage of a court proceeding, is:
> (a) Receiving one of the following types of public assistance: Temporary assistance for needy families, aged, blind, or disabled assistance benefits, medical care services under RCW 74.09.035, pregnant women assistance benefits, poverty-related veterans' benefits, food stamps or food

stamp benefits transferred electronically, refugee resettlement benefits, medicaid, or supplemental security income; or

      (b) Involuntarily committed to a public mental health facility; or

      (c) Receiving an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level.

RCW 10.101.010(3)(a)-(c).

The record establishes that Dustin Abrams has been incarcerated since before his 2004 convictions, is unemployed, has no income or assets, and cannot afford counsel. He receives public assistance. He owns no property. The superior court signed an order of indigency on August 16, 2022. Although the superior court did not expressly find Abrams to be indigent at the time of the June 2004 sentencing, Abrams averred that he has been indigent since March 2004. No facts contradict that Abrams was indigent at the time of sentencing in June 2004. Therefore, we remand to the trial court with instructions to strike the $500.00 VPA.

Vacatur of 2004 Convictions

Dustin Abrams assigns error to the superior court's denial of his motion to vacate his 2004 convictions. The superior court denied the motion after reading the controlling statute, RCW 9.94A.640(2)(e)(ii), as demanding that the applicant be released from all confinement, including confinement for other convictions, for at least five years. Abrams has been incarcerated continuously since his 2004 convictions.

The 2019 New Hope Act, codified in RCW 9.94A.640, seeks to promote successful reentry into society by offenders. LAWS OF 2019, ch. 331, § 3. RCW 9.94A.640 declares, in relevant part:

> (1) Every offender who has been discharged under RCW 9.94A.637 may apply to the sentencing court for a vacation of the offender's record of conviction. If the court finds the offender meets the tests prescribed in subsection (2) of this section, the court *may* clear the record of conviction by: (a) Permitting the offender to withdraw the offender's plea of guilty and to enter a plea of not guilty; or (b) if the offender has been convicted after a plea of not guilty, by the court setting aside the verdict of guilty; and (c) by the court dismissing the information or indictment against the offender.
> (2) An offender may not have the record of conviction cleared if:
> (a) There are any *criminal charges* against the offender pending in any court of this state or another state, or in any federal court;
> (b) *The offense* was a violent offense as defined in RCW 9.94A.030 or crime against persons as defined in RCW 43.43.830. . ..
>        . . . .
> (e) *The offense* is a class B felony *and less than ten years have passed since the later of: (i) The applicant's release from community custody; (ii) the applicant's release from full and partial confinement; or (iii) the applicant's sentencing date.*
> (f) *The offense* was a class C felony, other than a class C felony described in RCW 46.61.502 or 46.61.504, and less than five years have passed since the later of: (i) The applicant's release from community custody; (ii) the applicant's release from full and partial confinement; or (iii) the applicant's sentencing date.

(Emphasis added.) Theft of a firearm and theft in the first degree, two of Dustin Abrams' crimes, are class B felonies subject to section (2)(e) of RCW 9.94A.640. RCW 9A.56.030, RCW 9A.56.300. Second degree theft, the other 2004 offense, constitutes a class C felony subject to subsection (2)(f) of RCW 9.94A.640. RCW 9A.56.040.

8

RCW 9.94A.640 takes a step forward to remedy the problem of an offender facing obstacles when released from incarceration. Under public policy, a deserving offender should be restored to his preconviction status as a full-fledged citizen. *State v. Hawkins*, 200 Wn.2d 477, 495, 519 P.3d 182 (2022). This legislative intent aligns with the overall purposes of the Sentencing Reform Act of 1981, ch. 9.94A, RCW, which include protecting the public and offering the offender an opportunity to improve himself or herself. RCW 9.94A.010(4), (5); *State v. Hawkins*, 200 Wn.2d 477, 495 (2022).

RCW 9.94A.640 addresses the myriad of debilitating problems felons face when attempting to reintegrate into society. *State v. Hawkins*, 200 Wn.2d 477, 489 (2022). Long after serving their sentences, people with criminal histories face severe collateral consequences that can include barriers to voting, serving on a jury, holding public office, securing employment, obtaining housing, receiving public assistance, owning a firearm, getting a driver's license, qualifying for financial aid and college admission, qualifying for military service, and deportation for noncitizens. *State v. Hawkins*, 200 Wn.2d 477, 489 (2022).

Vacatur entitles an individual to rejoin society free of all penalties and disabilities resulting from the offense. RCW 9.94A.640(4)(a). In fact, the statute allows an offender, whose conviction has been vacated, to state that he has never been convicted of that crime for all purposes, including responding to questions on employment applications. *State v. Hawkins*, 200 Wn.2d 477, 489-90 (2022). A conviction vacated under

9

RCW 9.94A.640 is removed from the offender's criminal history.

RCW 9.94A.030(11)(b).

RCW 9.94A.640(1) outlines a two-step process for vacating an offender's convictions. First, a trial court must determine whether the convictions meet the legal requirements identified in RCW 9.94A.640(2). If the court determines that the conviction satisfies subsection (2) of the statute, the court engages in the second step and exercises its discretion to determine whether or not to clear the record of conviction. RCW 9.94A.640(1). In line with the statutory purpose, the trial court must focus on whether the applicant has demonstrated sufficient postconviction change to show rehabilitation. *State v. Hawkins*, 200 Wn.2d 477, 495 (2022).

Because some of Dustin Abrams' crimes were class B felonies, ten years must have passed from some event in order to qualify him for vacation of all 2004 convictions. RCW 9.94A.640(2)(e). The State argues that the ten years has not even begun to commence because Abrams remains incarcerated. The State maintains that interpreting RCW 9.94A.640(2)(e)(ii) to mean that ten years have passed since the offender's release from full or partial confinement for the specific Class B felony at issue and interpreting RCW 9.94A.640(2)(f)(ii) to mean that five years have passed since the offender's release from full or partial confinement for the specific Class C felony would defeat the purposes of the statute, place the statute in conflict with related statutes, and lead to absurd results. Abrams reads the statute to only demand that ten years have passed since his

incarceration for the 2004 crimes, which confinement ended sometime around 2006. We must decide whether RCW 9.94A.640(2)(e) and (f)'s references to release from community custody, release from confinement, and sentencing date relate only to the crimes sought to be vacated or extend to other crimes.

The court's primary duty in statutory interpretation is to discern and implement the legislature's intent. *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). In so doing, the court relies on many tested, commonsensical, and intelligent principles to divine the meaning of the statute, principles employed when interpreting other important and even sacred texts. *State v. Jimenez*, 200 Wn. App. 48, 52, 401 P.3d 313 (2017). We discern legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Association of Washington Spirits & Wine Distributors. v. Washington State Liquor Control Board*, 182 Wn.2d 342, 350, 340 P.3d 849 (2015). We also apply basic rules of grammar. *In re Forfeiture of One 1970 Chevrolet Chevelle*, 166 Wn.2d 834, 839, 215 P.3d 166 (2009).

We note that RCW 9.94A.640(2) repeatedly refers to "the offense," presumably the offense that the applicant seeks to vacate. Thus, the statute employs the definite article "the." We focus on RCW 9.94A.640(2)(e), which controls Class B felonies.

11

RCW 9.94A.640(2)(f), governing Class C felonies, uses the same critical language.

Subsection 2(e) reads:

> *The offense* is a class B felony and less than ten years have passed since the later of: (i) The applicant's release from community custody; (ii) the applicant's release from full and partial confinement; or (iii) the applicant's sentencing date.

(Emphasis added.)  We note that the subsection lists all three triggering events for the commencement of the ten years in the same sentence as "the offense."  We recognize that subsections (i), (ii), and (iii) do not specifically mention release from custody or confinement or the sentencing date as a result of any specific offense.  Nevertheless, based on ordinary sentence structure, those three events relate to "the offense."  Nowhere does the sentence structure suggest that any of the operative dates connect to other or later crimes.  The applicant's sentencing date would likely not refer to sentencing for another offense since it refers to one date only.  We should read the qualifying events in subsection (i) and (ii) accordingly.

Use of a definite article is a recognized indication of statutory meaning. *Guardado v. Guardado*, 200 Wn. App. 237, 243, 402 P.3d 357 (2017); *Department of Ecology v. City of Spokane Valley*, 167 Wn. App. 952, 965, 275 P.3d 367 (2012).  The use of the definite article "the" often signifies a narrowing intent, a reference to something specific, either known to the reader or listener or uniquely specified.  *Hickey v. Scott*, 370 Or. 97, 107, 515 P.3d 368 (2022).  Whereas definite articles like "the" restrict

12

the noun that follows as particularized in scope or previously specified by context, the indefinite "a" has generalizing force. *Nielsen v. Preap*, 586 U.S. ___, 139 S. Ct. 954, 965, 203 L. Ed. 2d 333 (2019) (citing Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)). The articles in a statutory text—the definite articles and the indefinite articles—should not be overlooked or discounted, but should be treated as being chosen by design and as intending a particularizing effect. *In re A.P.*, 245 W. Va. 248, 858 S.E.2d 873, 879 (2021).

In *Guardado v. Guardado*, 200 Wn. App. 237 (2017), this court highlighted the placement of the article "the" before the noun "cause" in CR 60(e)(1), which demanded that any motion to vacate a judgment be filed in "the cause." Based on a plain reading of the entire rule, the rule's language referenced the cause of action in which the judgment from which the movant sought relief was entered. This court reversed the superior court's vacation of a judgment because the movant filed her motion in a different cause.

In RCW 9.94A.640(2)(a), the legislature disqualified an offender from a vacatur if "any criminal charges" are pending against the offender. This subsection of the controlling statute illustrates that the legislature knew when it wished to reference other offenses. The legislature could have, but chose not to, insert the phrase "for any criminal charges" in RCW 9.94A.640(2)(e) and (f) when referencing community custody, confinement, and sentencing for purposes of triggering the five- and ten-year waiting periods.

13

We adopt Dustin Abrams' reading of RCW 9.94A.640(2)(e). The statute's reference to release from community custody or confinement extends only to release by reason of the offense or offenses sought to be vacated, not other offenses that may keep the offender incarcerated.

The State highlights that Dustin Abrams' interpretation of RCW 9.94A.640 would create a conflict between crimes that have community custody and those that do not. The offender serves community custody time at the end of all confinement time, including that time imposed on unrelated charges. RCW 9.94A.171(3)(a). Under Abrams' interpretation, crimes that require community custody would be ineligible for vacation until after the offender's ultimate release, and crimes that do not have community custody would be eligible for vacation years, if not decades, earlier, while the offender remains in prison.

The State makes an excellent point that almost persuades us to adopt its interpretation. But, the continued use of the phrase "the offense" in the statute convinces us of the correctness of our exegesis. We note that crimes that do not demand community custody typically entail less harm to the general public such that the legislature could legitimately distinguish for purposes of vacatur between those offenses that demand community custody and those that do not.

We also note that entry of a vacatur before the offender leaves prison affords little benefit to the offender. This recognition also almost persuades us to adopt the State's

interpretation of RCW 9.94A.640. The offender will later need to seek a vacatur of the convictions for which he remains incarcerated in order to claim being conviction free. But, under RCW 9.94A.640 and the policy of promoting and furthering rehabilitation while in prison, the offender should still be able to gain what little profit is available while in prison from the opportunity to gain vacatur of old crimes.

Our adoption of Dustin Abrams' reading of RCW 9.94A.640(2) does not necessarily lead to vacation of his 2004 convictions. The court must meaningfully consider evidence of mitigation and rehabilitation since the time of the crime and exercise its discretion based on its assessment of the extent of rehabilitation. *State v. Hawkins*, 200 Wn.2d 477, 481 (2022). The legislature's use of the word "may" in RCW 9.94A.640 constitutes a clear grant of discretion to the trial court. *State v. Hawkins*, 200 Wn.2d 477, 495 (2022).

When filing his vacatur motion, Dustin Abrams supplied the superior court with no evidence of rehabilitation that the superior court could weigh in exercising its discretion when determining vacatur. Therefore, we do not reverse the superior court's denial of the vacatur. Abrams remains free to file a new motion for vacatur with evidence of any rehabilitation.

The State emphasizes that Dustin Abrams has not reentered the community. According to the State, a person serving a murder sentence in state custody is not someone the legislature would wish have restored to his preconviction status as a full-

15

fledged citizen.  We disagree.  Someone convicted of murder can gain rehabilitation, return safely to society, and benefit from restoration of full citizen status.  The 2019 New Hope Act recognizes the possibility of redemption.

CONCLUSION

We affirm the superior court's denial of Dustin Abrams' petition for vacatur of his 2004 convictions without prejudice to Abrams filing a new petition with evidence of rehabilitation.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:


_____
Lawrence-Berrey, C.J.


_____
Cooney, J.