**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1784
_____

AARON HOPE; IWAN RAHARDJA; JESUS DE LA PENA;
RAKIBU ADAM; DUC VIET LAM; YELENA MUKHINA;
NAHOM GEBRETNISAE; ISMAIL MUHAMMED;
GLENN WEITHERS; KONSTANTIN BUGARENKO;
BRISIO BALDERAS-DOMINGUEZ; VIVIANA
CEBALLOS; WILDERS PAUL; MARCOS JAVIER ORTIZ
MATOS; ALEXANDER ALVARENGA; ARMANDO
AVECILLA; COSWIN RICARDO MURRAY; EDWIN
LUIS CRISOSTOMO RODRIGUEZ; ELDON BERNARD
BRIETTE; DEMBO SANNOH; JESUS ANGEL JUAREZ
PANTOJA; ALGER FRANCOIS

v.

WARDEN YORK COUNTY PRISON; WARDEN PIKE
COUNTY CORRECTIONAL FACILITY;
DIRECTOR PHILADELPHIA FIELD OFFICE
IMMIGRATION AND CUSTOMS ENFORCEMENT;
DIRECTOR UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

> Appellants

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-20-cv-00562)
District Judge: The Honorable John E. Jones, III

_____

Argued June 18, 2020
Before: SMITH, *Chief Judge*, HARDIMAN and SCIRICA,
*Circuit Judges.*[1]

(Opinion filed: August 25, 2020)

David Byerley
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868
Ben Franklin Station
Washington, DC 20044

Jeffrey S. Robins
United States Department of Justice
Office of Immigration Litigation
Room 6040
P.O. Box 878
Washington, DC 20044

Scott G. Stewart [Argued]
United States Department of Justice
950 Pennsylvania Ave., N.W.

_____

[1]Judge Shwartz is recused from this proceeding.

Washington, DC 20530
      *Counsel for Appellants*

Lawrence J. Joseph
Suite 700-1A
1250 Connecticut Avenue, N.W.
Washington, DC 200
      *Counsel for Amicus Immigration Reform Institute in
      favor of Appellants*

Eunice H. Cho
David C. Fathi
American Civil Liberties Union
915 15th St., N.W.
6th Floor
Washington, DC 20003

Carla G. Graff
Kelly A. Krellner
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Stephen B. Kang
Cecillia D. Wang
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111

Erika B. Nyborg-Burch
Vanessa Stine
Muneeda S. Talukder

American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19106

Witold J. Walczak, Esq. [Argued]
American Civil Liberties Union
P.O. Box 23058
Pittsburgh, PA 15222
        *Counsel for Appellees*

Kristin A. Macleod-Ball
American Immigration Counsel
1318 Beacon Street
Suite 18
Brookline, MA 02446
        *Counsel for Amicus American Immigration Council in
        favor of Appellees*

Susanna M. Buergel
Paul Weiss Rifkind Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019
        *Counsel for Amicus Robert L. Cohen, M.D., Joe
        Goldenson, M.D., Michael Puisis, D.O., and Brie
        Williams, M.D., M.S., in favor of Appellees*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

On April 7, 2020, the United States District Court for the Middle District of Pennsylvania ordered the immediate release of twenty-two immigration detainees (collectively, Petitioners) from the York County Prison (York) and Pike County Correctional Facility (Pike) amidst the COVID-19[2] pandemic. It did so *ex parte*, by granting Petitioners' motion for temporary restraining order (TRO) without affording the Government an opportunity to be heard. After staying its April 7, 2020 order, the District Court again mandated Petitioners' release on April 10, 2020. The Government appealed both orders. As we explained in *Hope v. Warden York County Prison*, 956 F.3d 156, 161–62 (3d Cir. 2020) (*Hope I*), the District Court's orders—which purported to be TROs—were in effect mandatory preliminary injunctions. Having determined in *Hope I* that we have jurisdiction, we now consider the merits of the Government's appeal.

I

This case followed closely on the heels of a similar one decided by the District Court. *See Thakker v. Doll*, — F. Supp. 3d —, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020). In *Thakker*, immigration detainees sought release from their detention in York, Pike, and a third facility. The District Court held the detainees were likely to succeed on their claim that their detention deprived them of substantive due process

---

[2] COVID-19 "is a highly contagious respiratory virus that poses unique risks in population-dense facilities." *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 157 n.2 (3d Cir. 2020) (*Hope* I) (quoting *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020)).

because of their advanced ages and medical histories. *Id.* at *9. So it ordered their release.

Three days after the District Court issued its order in *Thakker*, Petitioners filed their "Verified Petition for Writ of Habeas Corpus and Complaint for Emergency Injunctive Relief" seeking release from custody and alleging they were at risk of serious harm from COVID-19 while detained at York and Pike. They filed a joint habeas petition even though they: (1) vary in age from 28 to 69, with only one of them older than 65; (2) have divergent health conditions; (3) were detained for various reasons; (4) have unique criminal histories; (5) have individual flight risk profiles; and (6) have diverse home and family situations. Despite those distinguishing characteristics, the petition alleged they are "united by the fact that they are over age 65 and/or adults who have a serious pre-existing medical condition" and that "the United States Centers for Disease Control has determined [their conditions] put[] them at significantly higher risk of severe disease and death if they contract COVID-19." App. 28. The petition further averred that conditions at York and Pike place Petitioners at higher risk to contract COVID-19 because "risk mitigation is impossible" there. App. 79. They claimed their confinement deprives them of substantive due process because it constitutes punishment and because Respondents are deliberately indifferent to their serious medical needs. According to Petitioners, only release will rectify their unconstitutional confinement.

Petitioners provided a general description of their health conditions and little detail about their immigration circumstances. The petition stated that some are lawful permanent residents, while others seek adjustment of status through an ill spouse or because they have lived in this country since they were children. The petition described the criminal

6

records and histories for very few of the Petitioners and did so summarily. Federal law required some to be detained while others were detained at the discretion of the Secretary of the Department of Homeland Security or an immigration judge. *See* 8 U.S.C. § 1226(a), (c); and 8 C.F.R. §§ 1003.19, 1236.1(c); *see also Nielsen v. Preap*, 139 S. Ct. 954, 958–59 (2019).

The petition was accompanied by a motion for TRO, but Petitioners did not request *ex parte* relief. In fact, they emailed their filings to counsel for the Government and asked the Court to "immediately schedule a hearing." App. 86. Even though Petitioners' counsel promptly (and appropriately) engaged opposing counsel in the adversary process, the District Court entered its April 7 order *ex parte* without a hearing, relying heavily on its prior findings and decision in *Thakker*.

The April 7 order commanded the Government to immediately release Petitioners "on their own recognizance." App. 14. It also required Petitioners to self-quarantine for fourteen days after their release. *Id.* The terms of the injunction were to expire on April 20, 2020 at 5:00 p.m. *Id.* Finally, the Court ordered the Government—from which it had not yet heard—to show cause "why the [order] should not be converted into a preliminary injunction." *Id.*

Less than five hours after the April 7 *ex parte* order was entered on the docket, the Government entered its appearance, filed a motion to stay the immediate release order, and sought reconsideration based on the declaration of Assistant Field Office Director Joseph Dunn. The District Court granted a temporary stay of its *ex parte* order and ordered Petitioners to respond to the motion for reconsideration, which they did on April 8. That same day, the Government responded to the

petition and motion for TRO. Also on April 8, the Court scheduled a status conference for April 9, which it apparently held off the record. On April 10, the Government filed another declaration of Director Dunn.

Later on April 10, and again without holding a hearing and without discussing the Government's response in opposition to Petitioners' filings, the District Court entered an order: (1) denying reconsideration of its April 7 order; (2) lifting the temporary stay; and (3) reiterating the relief provided by the April 7 order, again mandating the release of Petitioners that day. App. 20–21. Like the April 7 order, the April 10 order instructed Petitioners to self-quarantine for fourteen days after their release. App. 21.[3]

The April 10 order purported to expire on April 20, 2020, but contradicted itself in two ways. It extended the "release period . . . until such time as the COVID-19 state of emergency as declared by the Governor of the Commonwealth of Pennsylvania is lifted, or by further Order of this Court." *Id.* at 21. And it terminated the release period "immediately if a Petitioner absconds." *Id.*

The April 10 order also imposed new conditions on both parties, stating:

> a. This Order requires Petitioners to comply with all Executive Orders . . . as well as national, state and local guidance

---

[3] The Government agreed to the release of Duc Viet Lam and Iwan Rajardja, so they were not included in the District Court's second release order.

8

regarding staying at home, sheltering in place, and social distancing;

b. This Order *does not prevent* the government from taking Petitioners back into *custody* should they commit *any further crimes* or otherwise *violate the terms* of their release;

c. The Petitioners *shall report* their whereabouts once per week *to their attorneys*, who in turn *shall report* to the Respondents *if a Petitioner has absconded*;

d. The Petitioners must appear at all hearings pertaining to their removal proceedings, and in the event that they are subject to a final order of deportation for which arrangements have been finalized within the period of this Order, they shall fully comply with the said order of deportation and all instructions pertaining thereto; and

e. Respondents may impose other *reasonable nonconfinement* terms of supervision that would not require Petitioners to violate national, state and local guidance regarding staying at home, sheltering in place, and social distancing.

App. 21–22 (emphases added).

The Government timely appealed the April 7 and April 10 orders.

9

II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). *Hope I*, 956 F.3d at 159 n.5, 162.

III

We review the District Court's orders under the standard of review for preliminary injunctions because they granted preliminary injunctive relief within the meaning of 28 U.S.C. § 1291(a)(1). *See Hope I*, 956 F.3d at 162. Rule 65 of the Federal Rules of Civil Procedure imposes preconditions on the issuance of injunctions, including TROs. For an injunction to issue:

> the plaintiffs had to demonstrate (1) that they are reasonably likely to prevail eventually in the litigation and (2) that they are likely to suffer irreparable injury without relief. If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm the [defendants] more than denying relief would harm the plaintiffs and (4) whether granting relief would serve the public interest.

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 105 (3d Cir. 2013) (internal quotations and citations omitted). Because the Court granted a mandatory injunction, a heightened standard applies. *Bennington Foods, LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008). So Petitioners bore a "particularly heavy" burden, *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994),

10

requiring them to show a substantial likelihood of success on the merits and that their "right to relief [is] indisputably clear," *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013) (quoting *Communist Party of Ind. v. Witcomb*, 409 U.S. 1235, 1235 (1972)).

We review the District Court's findings of fact for clear error, its legal conclusions de novo, and its decision to grant injunctive relief for abuse of discretion. *See K.A. ex rel. Ayers*, 710 F.3d at 105. An abuse of discretion exists when the decision rests "on an erroneous view of the law or on a clearly erroneous assessment of the evidence," *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990), which includes an improper application of the correct law to the facts, *United States v. Reyes-Romero*, 959 F.3d 80, 92 (3d Cir. 2020). Clear error exists "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

IV

With the legal framework just described in mind, we begin with the Government's procedural challenges. It contends the District Court erred by granting relief *ex parte*. The Government also claims the District Court erred when the Court absolved Petitioners of their duty to show entitlement to injunctive relief by ordering the Government to show cause

11

why the Petitioners were not entitled to a mandatory injunction and by applying reconsideration standards.

A

"As the Supreme Court has observed, 'our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted [to] both sides of a dispute.'" *Hope I*, 956 F.3d at 160 (quoting *Granny Goose Foods Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974)). And the Court has described due process in this way:

> Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

*Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (internal quotations and citations omitted).

Despite these principles, a TRO may be entered *ex parte*, but only if safeguards in Rule 65(b) are met. For example, Rule 65(b)(3) requires an expedited preliminary injunction hearing after an *ex parte* TRO is entered. And a court may not convert an *ex parte* TRO into a preliminary injunction without a hearing or issue an *ex parte* preliminary injunction. *See Granny Goose*, 415 U.S. at 439 & n.14 (Rule 65(b)'s stringent requirements restrict *ex parte* TRO's to

12

"preserving the status quo" and "preventing irreparable harm" only for the time "necessary to hold a hearing, and no longer").

Although Petitioners stated their prayer for relief alternatively as a request for a TRO or for a preliminary injunction, they never sought *ex parte* relief and their counsel advised the Court that they promptly served the Government. Accordingly, Petitioners' counsel did not include a Rule 65(b)(1)(B) certification required for *ex parte* relief. The Court failed to explain why the order had to issue without affording the Government an opportunity to be heard, in violation of Rule 65(b)(2). And it did so even though Petitioners requested a hearing and counsel for Respondents were well known to the Court from their involvement in the *Thakker* case.[4] All this was contrary to law.

B

The District Court's initial failure to include the Government in the proceedings created problems downstream when it issued the April 10 order. Instead of acknowledging the Government's substantive response to the petition and motion consistent with the prerequisites for issuing injunctive relief, the Court not only shifted the burden to the Government, but also required it to surmount the high hurdle applicable to a

---

[4] The Respondents in *Thakker* and *Hope* are identical except for one party (Clinton County). Each Respondent in *Hope* is represented by the same counsel from *Thakker* and the same attorney entered her appearance on behalf of the Respondent detention facilities involved in both actions. *Compare Thakker v. Doll*, M.D. Pa. Docket No. 1:20-cv-00480, *with Hope v. Doll*, M.D. Pa. Docket No. 1:20-cv-00562.

13

motion for reconsideration. *Hope I*, 956 F.3d at 162. Petitioners counter that the Government invited the error by filing its reconsideration motion. We disagree.

The District Court turned due process on its head when it required the party against whom it ordered injunctive relief to prove why such relief should not be continued. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("The point remains that the burdens at the preliminary injunction stage track the burdens at trial."); *see also* FED. R. CIV. P. 65(b)(3) (in expediting preliminary injunction hearing held after TRO issues "the party who obtained the order must proceed with the motion"). The burden to prove clear entitlement to injunctive relief always stays with the party requesting that relief. So the District Court erred when its April 10 order required the Government to show: (1) new evidence before it was ever afforded the chance to present any evidence before the April 7 order was issued; (2) a change in the law before it was allowed to brief the Court; and (3) the need to correct a clear error of law or prevent manifest injustice. App. 18 (citing *Max's Seafood Café by Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). For these reasons, we hold that the District Court abused its discretion when it applied reconsideration standards to issue the April 10 order.

C

The April 10 order violates other provisions of Rule 65. It mandates Petitioners' release until the Governor of Pennsylvania lifts the state of emergency or the Court orders otherwise, while purporting to expire on April 20, 2020. The contingent nature of the Governor's state of emergency rendered the order indefinite contrary to the fourteen-day time

14

limit in Rule 65(b)(2). *See Hope I*, 956 F.3d at 162. And it also rendered the provision indeterminate in violation of the specification requirements of Rule 65(d).

Rule 65(d) provides that "[e]very order granting an injunction and every restraining order *must* state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(B) & (C) (emphasis added). These requirements are not mere technicalities. They "relate[] to the court's awesome civil and criminal contempt powers. Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." *Inmates of Allegheny Cnty. Jail v. Wecht*, 754 F.2d 120, 129 (3d Cir. 1985) (citations omitted). We recognize that temporary and preliminary injunctive relief orders issue in the context of "exigent circumstances and at times may lack the precision of final decrees." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). But "Rule 65(d) was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). In short, a party must "receive fair and precisely drawn notice of what the injunction actually prohibits [or requires]." *Granny Goose*, 415 U.S. at 444.

Other terms of the District Court's April 7 and 10 orders are too indefinite to satisfy Rule 65(d). Under that subsection, an injunction "should be phrased in terms of objective actions, not legal conclusions." *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) (internal quotations and citations omitted). The April 10 order permits the Government to impose "reasonable

15

nonconfinement terms of supervision." App. 22. But "reasonable" is capacious enough to provoke disagreement between Petitioners and the Government regarding the propriety of any additional terms of supervision. The order also permits the Government to re-detain Petitioners if "they commit any further crimes" or "violate the terms of their release." App. 21. That provision raises more questions than it answers, however. Do "further crimes" include traffic violations? We doubt that was the District Court's intention. Perhaps the Court meant only felonies? But Petitioners could "violate the terms of their release" without committing any crime at all. So the April 10 order is not just vague, it is also over- and under-inclusive. The Government would be acting at its peril if it were to re-detain Petitioners.

The April 7 and April 10 orders also require affirmative acts by Petitioners, subject to contempt and re-detention if they fail to comply. Both orders mandate self-quarantine without explaining what that entails. The April 10 order requires Petitioners "to comply with all . . . national, state and local guidance regarding staying at home, sheltering in place, and social distancing," *id.*, but does not specify what constitutes "guidance." It also compels Petitioners to report their whereabouts to their counsel, who in turn are required to report absconsion. App. 21–22. Must counsel report only known absconsion? What about likely absconsion or a failure to report each week? The lack of specificity as to affirmative acts required by Petitioners and their counsel in the order also contravenes Rule 65(d).

Finally, the District Court failed to order bond. Under Rule 65(c), the absence of a bond precludes issuance of an injunction. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (court can excuse bond required for

16

injunction only on "specific finding" that "rare exception" applies). These violations of Rule 65 were legal error.

V

Procedural missteps often lead to substantive errors, and that is true in this case as well. The District Court abused its discretion when it held that Petitioners showed a substantial likelihood of success on the merits of their claims. Before we address that issue, however, we must determine whether Petitioners properly brought their claims via petition for writ of habeas corpus.

The parties dispute whether release sought on the basis of *conditions* of confinement is cognizable under the habeas statute. "Of course, the party who brings a suit is master to decide what law he will rely upon." *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913). Petitioners brought an action seeking only the writ of habeas corpus pursuant to 28 U.S.C. § 2241, and they reiterate on appeal that they do not "seek[] to *modify* their conditions [of confinement]" and "the only relief sought by Petitioners—the only adequate relief for the constitutional claims—is release, which is unequivocally a habeas remedy." Pet'rs' Br. 50 (internal quotations and citations omitted).

The Government contends that "[h]abeas [] is an improper vehicle . . . for detainees to challenge their conditions of confinement." Gov't's Br. 29. If the Government is correct, Petitioners cannot show likelihood of success. The District Court held that Petitioners properly brought their petition for release as one seeking the writ of habeas corpus. We agree.

17

The traditional function of the writ of habeas corpus is to secure release from unlawful executive detention. *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Where a petitioner seeks release from detention, habeas (not a § 1983 action seeking release) is proper. Even where a complaint seeks both damages pursuant to § 1983 and habeas relief, the damages action should be stayed while habeas is exhausted. *Tedford v. Hepting*, 990 F.2d 745, 749 (3d Cir. 1993).

The Government argues that under *Leamer v. Fauver*, 288 F.3d 532, 542 (3d Cir. 2002), Petitioners cannot challenge their conditions via habeas. Leamer was a prisoner who filed a § 1983 action challenging prison restrictions that denied him required treatment. We determined that Leamer's claim was properly brought under § 1983. *Leamer*, 288 F.3d at 542. Our discussion of challenges requiring resort to habeas and our holding that the use of § 1983 was appropriate in that case does not undermine the availability of habeas to Petitioners here, however.

In addressing the nature of habeas and § 1983, we observed:

> Although both § 1983 and habeas corpus allow prisoners to challenge unconstitutional conduct by state officers, the two are not coextensive either in purpose or effect. Habeas relief is clearly quite limited: "The underlying purpose of proceedings under the 'Great Writ' of habeas corpus has traditionally been to 'inquire into the legality of the detention, and the only judicial relief authorized was the discharge of the prisoner or his admission to bail, and that only if his detention were found to be

18

unlawful.'" *Powers of Congress and the Court Regarding the Availability and Scope of Review,* 114 Harv. L. Rev. 1551, 1553 (2001) . . . . There is only a narrow subset of actions that arguably might properly be brought as either, that is, where the deprivation of rights is such that it necessarily impacts the fact or length of detention. In a series of decisions, the Supreme Court has made it clear that for those cases, the narrower remedy, the habeas petition, is the only available avenue of relief.

*Leamer*, 288 F.3d at 540. We expressly recognized that where the remedy sought was release from detention, the party was required to "proceed by way of habeas petition." *Id.* at 540–41 (citing *Edwards v. Balisok*, 520 U.S. 641 (1997)).

As early as 1949, our Court recognized the potential for habeas as a means of challenging unconstitutional conditions of confinement. *See Johnson v. Dye*, 175 F.2d 250, 256 (3d Cir. 1949) (en banc) (holding that habeas relief releasing petitioner was the appropriate remedy to avoid cruel and unusual punishment inflicted in Georgia prisons), *rev'd on other grounds*, *Dye v. Johnson*, 338 U.S. 684 (1949) (exhaustion required). And in *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973), the Supreme Court recognized that a challenge to conditions of confinement rendering otherwise lawful custody unconstitutional arguably would lie in habeas. As recently as 2017, the Supreme Court observed that this remains an open question, however. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862–63 (2017).

We have never held that a detainee cannot file a habeas petition to challenge conditions that render his continued

detention unconstitutional. Although the context of the vast majority of habeas cases involve challenges to criminal judgments, the language of the habeas statute justifies resort to the writ by non-prisoner detainees. Under 28 U.S.C. § 2241, district courts may grant the writ, but their power to grant it is restricted. For example, the writ is unavailable to persons detained as enemy combatants. *See* 28 U.S.C. § 2241(e). This suggests that, where the exclusion in § 2241(e) does not apply, the writ is available to immigration detainees like Petitioners here, who are not challenging convictions or sentences. So the fact of Petitioners' present confinement at York and Pike and the constitutionality of their conditions of confinement is a matter properly challenged by petition for the writ. *Accord Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020).

In recognizing the viability of this § 2241 claim we are not creating a garden variety cause of action. As the Supreme Court has instructed: "habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate." *Hensley v. Mun. Court, San Jose Milpitas Judicial Dist.*, 411 U.S. 345, 351 (1973). We acknowledged as much. *See Ali v. Gibson*, 572 F.2d 971 (3d Cir. 1978), *superseded by statute on other grounds as recognized in Callwood v. Enos*, 230 F.3d 627, 633 (3d Cir. 2000). There, we noted that the petitioner, who had been convicted in the Virgin Islands of several counts of first-degree murder, assault, and robbery, and who was later incarcerated in Georgia, might not be able to assert a § 2241 claim. We observed that, at best, his claim rose "to a possible habeas attack on the conditions of confinement, cognizable in a federal

20

habeas action *only in extreme cases*." *Id.* at 975 n.8. (emphasis added). Given the extraordinary circumstances that existed in March 2020 because of the COVID-19 pandemic, we are satisfied that their § 2241 claim seeking only release on the basis that unconstitutional confinement conditions require it is not improper.[5]

For these reasons, we hold that Petitioners' claim that unconstitutional conditions of confinement at York and Pike require their release is cognizable in habeas.

VI

We turn now to likelihood of success on the merits. Petitioners claim their conditions of confinement violate the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. As immigration detainees, Petitioners are entitled to the same due process protections as pretrial detainees. *E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019). Petitioners are in federal custody pursuant to the INA and housed in state facilities, so they are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982). Although the Eighth Amendment does not apply here, *Whitley v. Albers*, 475 U.S. 312, 318 (1986), the substantive due process guarantees afforded detainees like Petitioners are at least as robust as Eighth Amendment protections afforded prisoners, *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987). Applying this framework, we conclude the District Court abused its discretion when it held

---

[5] We do not address at this time whether a § 2241 claim may be asserted in less serious circumstances.

21

that Petitioners showed a substantial likelihood of success on the merits of their claims.

A

Petitioners advanced their substantive due process claim under two separate but related theories: (1) because of their age and healthcare needs, the conditions at York and Pike subject them to punishment; and (2) the Government was deliberately indifferent to their serious medical needs. The District Court determined Petitioners were likely to succeed under both theories.

The Government contends Petitioners can proceed only under the deliberate indifference theory, citing to *Sharkey*, 928 F.3d at 309. There are two problems with this argument. First, in *Sharkey*, we held the detainee plausibly stated a claim for unconstitutional punishment for an alleged sexual assault by a detention facility employee. Our discussion of deliberate indifference related to the detainee's claim against Sharkey's *fellow employees* and *supervisor* for their failure to protect the detainee against the known risk of serious harm. 928 F.3d at 308. Second, we held long ago that substantive due process proscribes punishment of non-prisoners. *See Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005) (*Hubbard I*). So the District Court was correct to address both theories.

B

We first address Petitioners' claim that their detention is unconstitutional punishment. In accordance with the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 549 (1979), detainees may not be punished before they are adjudicated guilty. *Hubbard v. Taylor (Hubbard II)*, 538 F.3d

22

229, 231 (3d Cir. 2008). Petitioners asserted—and the District Court found—that, *if* Petitioners are exposed to COVID-19 and *if* they contract the virus, their ages and medical conditions put them at "imminent risk" of serious illness, including possible death. App. 2, 9, 39–40 & nn. 2–3; Supp. App. 7. The District Court articulated its findings as to the conditions of each Petitioner that subjected the Petitioner to increased risk if they contracted COVID-19. These individual findings are not clear error. Nevertheless, the District Court erred in holding that because age and medical conditions put them at increased risk if they contracted the virus, Petitioners were likely to show the Government subjected them to punishment.

The touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish or are "but an incident of some other legitimate governmental purpose." *Hubbard II*, 538 F.3d at 232 (quoting *Bell*, 441 U.S. at 538). "[T]he ultimate question" is whether conditions are "reasonably related to a legitimate governmental objective." *Id.* at 236 (quoting *Bell*, 441 U.S. at 549). If Petitioners are subject to conditions unrelated to a legitimate governmental objective, "we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees *qua* detainees.'" *Sharkey*, 928 F.3d at 307 (quoting *Hubbard II*, 538 F.3d at 232). *Hubbard I* further instructs that we consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose. *Hubbard I*, 399 F.3d at 159–160; *see, e.g.*, *Union Cnty. Jail Inmates v. DiBuono*, 713 F.2d 984, 995–96 (3d Cir. 1983) (though double-bunking involved cramped, crowded cells for sleeping, it was not

punishment because it eliminated floor mattresses and permitted more recreational space).

In assessing whether conditions and restrictions are excessive given their purposes, the courts must acknowledge that practical considerations of detention justify limitations on "many privileges and rights." *Bell*, 441 U.S. at 545–46. Though not a convicted prisoner, a detainee "simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546. Thus, "[t]he fact of confinement as well as the legitimate goals and policies of the [] institution limits [Petitioners'] retained constitutional rights." *Id.*

Important here—and largely ignored by the District Court and Petitioners—are the legitimate objectives and difficulties of managing a detention facility, *Hubbard II*, 538 F.3d at 233, and the objectives of immigration detention: ensuring appearance at detention proceedings and protecting the public from harm. *See DiBuono*, 713 F.2d at 993; 8 U.S.C. § 1226(c).

As the Supreme Court cautioned in *Bell v. Wolfish*:

In determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these

24

considerations, courts should ordinarily defer to their expert judgment in such matters.

441 U.S. at 540 n.23 (citations omitted); *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984) (noting the "very limited role that courts should play in the administration of detention facilities"). We defer to administrators on matters of correctional facility administration "not merely because the administrator ordinarily will . . . have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government not the Judicial." *Bell*, 441 U.S. at 520.

The District Court could see "no rational relationship between a legitimate government objective and keeping Petitioners detained in unsanitary, tightly-packed environments—[because] doing so would constitute a punishment to Petitioners." App. 10 (quoting *Thakker*, 2020 WL 1671563, at *8). But Petitioners' confinement implicates multiple legitimate governmental objectives, including: (1) ensuring Petitioners' appearances at removal proceedings; (2) protecting the public; and (3) managing the detention facilities. The District Court erred when it failed to consider these legitimate objectives.

As to the conclusion that conditions at York and Pike were "unsanitary," the District Court relied on evidence from a prior case and ignored the Government's improvements at the facilities. In its April 7 decision, the Court made the following findings as to conditions at York and Pike based on its findings in *Thakker* and after considering only Petitioners' filings:

25

- four Pike detainees (other than Petitioners) and four Pike employees tested positive for COVID-19;
- one York detainee tested positive;
- staff leave the facilities and return but do not reliably wear gloves and masks when interacting with inmates;
- temperature checks, even as to those thought to be exposed to the virus, were infrequent;
- cell blocks housing individuals testing positive are not thoroughly evacuated and cleaned; and
- symptomatic inmates remain in general housing for days, and even once quarantined, others exposed to them were not tested.

App. 7–8, 10. The Court observed (before the Government could respond) that it saw no indication from Petitioners' filings that conditions had improved since its decision in *Thakker* because people tested positive at both York and Pike, and it "assumed" positive COVID-19 cases must be much higher. App. 7.

Then, in its April 10 decision, when the Court considered only the Government's reconsideration motion, it made just one additional comment we construe as a "finding" as to conditions: "[w]hile [the facilities] may have ramped up their sanitation protocols, the simple fact that inmates are incapable of social distancing in the facilities remains." App. 20. The Petition and supporting declarations described as "ideal" the social distancing parameter of six feet. The Court made that "ideal" a *sine qua non* of constitutional detention for

26

individuals at higher risk of serious harm if they contract COVID-19. In doing so, the Court was not "mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539.

Even more fundamentally, the District Court never addressed the Government's substantive response to the petition and motion for TRO. Nor did it meaningfully consider pertinent evidence on conditions provided by the Government, including social distancing efforts at York and Pike. According to the Government's filings, in the wake of COVID-19, it is complying with guidance from the CDC and epidemiologists from ICE Health Services Corps., and both York and Pike were operating at approximately 60 percent capacity (York can hold 2,245 inmates but had 1,341; Pike can hold 375 but had 221). Upon admission, detainees were screened for disabilities and conditions, as well as for fever, respiratory illness, exposure to an area with many COVID-19 cases, and known contact with someone who tested positive within the previous two weeks. If there had been such contact, any exposed detainees would be placed in a cohort for 14 days with daily monitoring for symptoms. If a detainee presented with COVID-19 symptoms, he or she was isolated and tested. Detainees who began to show any COVID-19 symptoms were isolated, as were their cellmates. Those testing positive were placed in medical isolation and quarantined. In addition, York and Pike provided: masks to detainees; hand sanitizer and hygiene education to staff; and soap, water, and hard surface disinfectant to every housing unit. Both facilities encouraged staff to use sanitizer, soap, water, and disinfectant often and liberally. They encouraged staff to clean high traffic and high contact areas

27

multiple times throughout the day and medical staff were on-site around the clock with the ability to admit patients to the local hospital. York and Pike also administered temperature checks to staff and vendors and suspended tours and visitation. Professional visits were contactless. Finally, all staff, contractors, ICE Enforcement and Removal Operations personnel, and medical staff wore N95 masks; kitchen staff wore surgical masks; and isolated detainees wore N95 masks when they left their cohort housing unit. At Pike, movement was staggered and meals were served in cells. All of these efforts were material to the District Court's assessment of the conditions challenged as punishment, yet it addressed none of them.

*Bell* requires us to consider whether the Government imposed the challenged conditions for the express purpose of punishment, and if not, whether they are rationally connected to a legitimate purpose but excessive in relation to its purpose. 441 U.S. at 538.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539.

Petitioners do not argue the Government subjected them to any conditions at York and Pike intended to harm them. Instead, they contend broadly the Government has no legitimate interest in detaining them in violation of their constitutional rights. But that truism sheds no light on the merits of their claims. Nor did the District Court's determination that the Government has no legitimate interest in detaining Petitioners in "unsanitary, tightly-packed environments." App. 10. In so concluding, the Court ignored legitimate governmental objectives and did not assess the conditions at York and Pike as of April 10.

We also reject—as contrary to Supreme Court precedent and federal statute—the District Court's view that, because the Government has means other than detention to effectuate the INA's provisions for exclusion or expulsion of aliens, Petitioners' civil detention cannot be rationally related to a legitimate government purpose. Detention of aliens pending their removal in accordance with the INA is constitutional and is supported by legitimate governmental objectives. *See Demore v. Kim*, 538 U.S. 510, 531 (2003); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). In fact, Congress has deemed the detention of criminal aliens so important that it is required by statute. 8 U.S.C. § 1226(c). These congressional objectives held constitutional by the Supreme Court—detention of aliens in removal proceedings and mandatory detention of criminal aliens—render unsound the District Court's conclusion that civil detention of aliens in removal proceedings is tantamount to punishment. *See Nielsen*, 139 S. Ct. at 959 (quoting § 1226(a)) (Congress, through 8 U.S.C. § 1226(a), "empowers the Secretary of Homeland Security to arrest and hold an alien 'pending a decision on whether the alien is to be removed from the United States.'");

29

*see also* 8 U.S.C. § 1226(c) (mandatory detention for those convicted of crimes of moral turpitude, controlled substances offenses, and terrorism offenses); 8 U.S.C. § 1231(a)(2) (mandatory detention for certain aliens ordered removed); 8 U.S.C. § 1231(a)(6) (detention beyond removal period for aliens ordered removed and determined a risk to the public or not likely to comply with the order).

Considering all the responsive measures specifically implemented to detect and to prevent spread of the virus, the challenges of facility administration during an unprecedented situation, and the purposes served by detention—Petitioners did not show a substantial likelihood of success on their claim that the conditions of their confinement constitute unconstitutional punishment. We therefore hold the District Court erred as to its punishment determination.

C

Petitioners argue in the alternative that the Government deprived them of substantive due process when it acted with deliberate indifference to their serious medical needs (*i.e.*, their vulnerability to COVID-19 because of their ages and medical conditions). *See Helling v. McKinney*, 509 U.S. 25, 34–35 (1993) (recognizing claim of deliberate indifference of officials to exposure to tobacco smoke that poses unreasonable health risk); *Palakovic v. Wetzel*, 854 F.3d 209, 224 (3d Cir. 2017) (particular vulnerability to suicide due to mental health conditions); *Natale*, 318 F.3d at 582 (particular vulnerability due to insulin dependent diabetes). To establish deliberate indifference, Petitioners must show the Government knew of *and disregarded* an excessive risk to their health and safety. *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

30

Our decision in *Palakovic*—which involved a pretrial detainee's "particular vulnerability"—is relevant here. 854 F.3d at 218. There we addressed allegations that officials showed deliberate indifference toward a detainee's exposure to a substantial risk of serious damage to his future health—that his particular vulnerability to suicide combined with detention conditions created a substantial risk of suicide and attempted suicide. *Id*. at 226. We recognized *even if detention officials afford some care* to the detainee, it still might not satisfy the Constitution's demands in every situation. *Id.* at 228. But "mere disagreement" as to the response to the risk to Petitioners in light of their medical condition will not support constitutional infringement. *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Deliberate indifference requires significantly more than negligence. *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998). Indeed, deliberate indifference "is a 'subjective standard of liability consistent with recklessness as that term is defined in the criminal law.'" *Natale*, 318 F.3d at 582 (quoting *Nicini*, 212 F.3d at 811).

The context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference that "shocks the conscience" for a substantive due process violation. *Lewis*, 523 U.S. at 846. Just as we afford leeway to prison medical officials in diagnosing and treating a detainee's physical and mental health, deference is due prison administrators here. The Supreme Court cautioned in *Lewis*:

> Rules of due process are not . . . subject to mechanical application *in unfamiliar territory*. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the

31

> constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

523 U.S. at 850 (emphasis added).

The District Court correctly observed that COVID-19 presents "highly unusual and unique circumstances," App. 12, that have "radically transformed our everyday lives in ways previously inconceivable," App. 6, and have "altered [our world] with lightning speed . . . and unprecedented [results.]" App. 13. So we must evaluate the Government's response to the virus in that context. But the Court's orders do not indicate any serious consideration of the Government's recent efforts at York and Pike, save for a passing reference in the April 10 order that the Government had "ramped up [] sanitation protocols." App. 20.

In this context, Petitioners urge that because the virus has no vaccine or cure, exposure to it is per se unconstitutional. They also claim "[s]ocial distancing and proper hygiene" are the only "effective means" to prevent Petitioners from contracting the virus in detention, and "[p]reventative measures remain impossible at [York and Pike]." App. 106. In essence, they argue that the Government must eliminate *entirely* their risk of contracting COVID-19. That task is not the constitutional standard, however. Although the District Court criticized the Government for the lack of "effective containment measures," and for not doing "nearly enough" to combat COVID-19, App. 7–9, those critiques are not tantamount to establishing the Government's deliberate indifference.

32

Nor does a failure to eliminate all risk establish that the Government was deliberately indifferent to their serious medical needs. Recognizing challenges inherent in the detention setting, CDC guidance suggests placing detainees into cohorts where social distancing is not practical. CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, (last visited Aug. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (explaining that social-distancing strategies "will need to be tailored to the individual space in the facility and the needs of the population and staff" and that "[n]ot all strategies will be feasible in all facilities"). The petition and supporting declarations rely on CDC literature and recommendations. And the District Court relies heavily on its decision in *Thakker*, which in turn relies on CDC guidance for support. Yet the Court said nothing about CDC guidance specific to detention facilities.

The record shows that the Government increased its efforts to minimize risk by improving hygiene and decreasing exposure even as information on the virus changed. But the Court undertook no analysis of those efforts. Instead, the Court summarily concluded that the efforts were not enough. The Court made no specific findings regarding how each Petitioner was housed. Instead, it determined "that inmates are incapable of social distancing in the facilities." App. 20.

In sum, we hold that Petitioners fell well short of establishing that the Government was deliberately indifferent toward their medical needs. Considering the record as a whole, we have a definite and firm conviction that a mistake has been committed. Petitioners did not show a likelihood of success,

33

much less a strong likelihood of success, that their substantive due process rights were violated by either punishment or deliberate indifference to their serious medical needs.

## VII

In addition to its errors regarding Petitioners' likelihood of success on the merits, the District Court erred in evaluating irreparable harm to Petitioners in the absence of relief, balancing the harms to each side, considering the public interest, and fashioning an "all-or-nothing" remedy.

## A

Assuming Petitioners could succeed in showing likelihood of success, before balancing the harms and considering the public interest, the District Court was required to find that each Petitioner showed they would suffer irreparable injury absent relief. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176, 179 (3d Cir. 2017).

After finding Petitioners are "all at heightened risk for severe complications from COVID-19," the District Court found they faced irreparable harm "should they contract" the virus. App. 9. This circular reasoning does not support relief because it applies regardless whether Petitioners are detained or released.

Moreover, in assessing irreparable harm, the Court should have considered several factors for each individual (beyond just their ages and medical conditions) because "the personal nature of constitutional rights" is a "cardinal principle[] of our constitutional order," *New York v. Ferber*, 458 U.S. 747, 767 (1982). Yet a fundamental problem pervades

34

the District Court's analysis: it treated Petitioners as a unit instead of as individuals with their own unique medical histories, medical risks, healthcare access needs, detention conditions, and release circumstances. It should have assessed all of these factors for each Petitioner to determine whether they would suffer more harm in detention than if released.

For example, the District Court did not consider the particular confinement conditions of each Petitioner at York and Pike. Nor did it compare the conditions of the particular communities to which each Petitioner would be released. Questions abound on this point. How prevalent was the virus in their home communities? Would they live in close quarters with many family members or others? Were their families or roommates exposed to the virus or at risk of exposure? How would their access to healthcare at home compare to that provided at York and Pike? In other words, were they more likely to contract the virus than if they remained detained? In sum, the District Court's failure to make a particularized inquiry and individualized findings as to the comparative risk faced by each Petitioner inside and outside of detention was error.

B

The District Court's failure to make particularized findings also pervaded its balancing of harms, which likewise was error. The comparison of harm to the Government as opposed to the harm to Petitioners turns mostly on matters of public interest because these considerations "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the District Court's consideration of risk to the public's safety before providing preliminary injunctive relief is crucial. Yet the District Court did not address risk of

harm to the public in terms of the Petitioners' individual criminal history and risk of flight nor did it adequately consider associated burdens on public healthcare by each Petitioner's release.

The District Court said it "cannot find, in the face of the scope of the COVID-19 pandemic that is washing through this country and the subject facilities, that the public interest favors continued detention of civil immigration detainees with underlying health conditions that render them particularly vulnerable were they to contract COVID-19." App. 19–20. This analysis of the public interest suffers from the same flaw we addressed in *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir. 1980), where the public interest "was expressed only in general and abstract terms." *Id.* at 357. By merely acknowledging that the public's interest is not served by the Government violating constitutional rights, the District Court rendered the public interest "no more than a makeweight for the court's consideration of the moving party's probability of eventual success on the merits." *Id.* at 358. The Court thereby improperly eliminated the public interest from the required showing for preliminary injunctive relief.

Although the District Court ordered Petitioners to self-quarantine, it neither specified what that entails nor assessed each Petitioner's ability to do so, and it undertook no consideration of the risk that Petitioners might spread COVID-19 when released into the public. The notion that release lessens burdens on local healthcare resources requires a comparison of individual circumstances. Because nearly all Petitioners contended they have urgent and continuing health needs, the District Court should have considered burdens associated therewith on public healthcare resources.

36

In its April 10 decision, the Court stated it "respects the Respondents' position that certain Petitioners pose a flight risk or danger to the community," App. 19, and surmised that because of travel restrictions associated with COVID-19, including worldwide travel restrictions, the risk of absconding "is low," App. 12. So the District Court treated Petitioners as if they all had the same low flight risk, and it did so without even considering whether any of them had a prior history of failing to appear or danger to the community.

Moreover, the Court made no findings as to risks posed in light of each Petitioner's criminal history. Instead, in its April 10 decision it stated to "allay some of the Respondents' fears," App. 20, it would include terms of release to "quell[]" concerns of flight risk and danger, App. 19. Petitioners' individual criminal histories directly relate to the harm to the public by their release and the District Court's failure to analyze those histories is especially problematic since many Petitioners were detained by congressional mandate or after an immigration judge had determined that detention was required to protect the public. Indeed, some of their criminal histories involve serious offenses, such as aggravated assaults, threatening sexual assault, first degree robbery, and weapons violations.

Finally, the District Court erred in not considering as part of the balancing of harm practical difficulties involved in locating and re-detaining Petitioners should the Government ultimately prevail or should a Petitioner abscond, commit a crime, or violate another term of release. *See Hope I*, 956 F.3d at 162.

C

The District Court also erred in fashioning relief. The Court too readily accepted the Petitioners' all-or-nothing proposition that anything short of immediate release cannot remedy their plight.[6]

Because it improperly elevated ideal social distancing to a constitutional standard, the District Court granted release without fully considering other options potentially available to it. Without a hearing and without considering the Government's opposition under the appropriate standard, it's no surprise that in addition to failing to consider the

---

[6] Petitioners rely on *Brown v. Plata*, 563 U.S. 493, 521 (2011), to justify release as *the* remedy for the asserted unconstitutional conditions of confinement. But that case involved the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, and a remedial injunction stipulated to by the state to address mental and medical care in overcrowded California prison populations. The PLRA includes release as a potential remedy to address unconstitutional prison conditions, but it does not apply to civil immigration detainees. *See* 18 U.S.C. § 3626(g)(3). And even if it did, Petitioners' quest for immediate release would have been a non-starter because the statute mandates that relief for unconstitutional prison conditions (1) be "narrowly drawn;" (2) "extend no further than necessary to correct the harm the court finds requires preliminary relief;" (3) be "the least intrusive means necessary to correct that harm;" and (4) include release only where a proper order was entered as to conditions, the respondent had a reasonable amount of time to comply with it, and compliance failed. *See* 18 U.S.C. § 3626(a)(2) and (3).

Government's increased social distancing and sanitation efforts at York and Pike in response to evolving circumstances, the Court failed to explore alternatives to avoid any irreparable harm to Petitioners.

The Petitioners' quest for nothing short of release appeared to leave little room for a remedy short of the most extreme one. *See, e.g.*, *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) (habeas vehicle limits type of relief); *O.M.G. v. Wolf*, 2020 WL 4201635, at *8 (D.D.C. 2020) (immigration detainees seeking only "wholesale release" in light of risk of contracting COVID-19 by application for preliminary injunction not entitled to relief because they failed to show that nothing short of that relief can redress their injuries). In view of the legitimacy of mandatory and discretionary detention, even after a district court makes findings on the merits sufficient to support preliminary relief, it must carefully consider whether alternatives to release are appropriate before ordering release.

As to the terms of Petitioners' release, the Court did not explain why it rejected the Government's alternative request that if the Court ordered release that it should also order that: *the Detainees'* "*counsel report* each Petitioner's whereabouts every 7 days;" they "be placed on home detention;" and they "wear ankle bracelets affixed by ICE." App. 194 (emphasis added). The need for significant measures designed to ensure the Petitioners, once released, would not be "in the wind"

seems quite obvious,[7] particularly with respect to those who had a history of failing to appear or of flight.

True enough, the District Court's April 10 order imposed some terms on the Petitioners' release to "allay" fears and "quell" concerns, such as reiterating their legally mandated appearance at any removal hearings and adding that they report their whereabouts to their own attorneys. But its orders did not require any report to the Government, which would have provided some additional protection against risk of absconsion. Indeed, when asked at argument about the court-mandated weekly report by each Petitioner, their counsel admitted that Petitioners' reporting obligation had not been regularized. *See* Oral Argument June 18, 2020 at 53:10–53:24. Finally, the Court did not explain its decision to release Petitioners on their own recognizance, instead of, at the very least, ordering home detention and monitoring by the Government.

## VIII

We acknowledge difficulties faced by trial courts in emergent matters and the need to act immediately, particularly during a pandemic. But exigent circumstances do not empower a court to jettison fundamental principles of due process or the rules of procedure that govern such matters. For the reasons we have explained, the District Court committed procedural and substantive errors that require us to vacate the April 7 and April 10, 2020 orders and remand the case for further proceedings consistent with this opinion.

---

[7] Some detainees released on their own recognizance in *Thakker*, 2020 WL 1671563, at *10, absconded.